IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Brief February 6, 2003

**IN RE: T.L.R. AND A.W.R.**

**STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES
v.
SANDRA JANE RILEY**

**An Appeal from the Juvenile Court for Robertson County
No. D-19108     Max D. Fagan, Judge**

---

**No. M2002-01101-COA-R3-JV - Filed March 4, 2003**

---

This case involves the termination of parental rights. The mother of the two young children at issue had a history of cocaine and marijuana abuse. In September 1999, the state department of children's services obtained custody of the children and placed them in a foster home. While the children were in foster care, the mother participated in drug rehabilitation programs and attempted to obtain permanent employment. The mother made some progress, but repeatedly relapsed back into drug and alcohol use, and failed to procure a permanent job or a permanent residence. In August 2001, the State filed a petition to terminate the mother's parental rights. The trial court granted the State's petition. The mother now appeals. We affirm, finding clear and convincing evidence that the mother had failed to comply with the permanency plan, that conditions that prevented the children's safe return still persisted, and that termination of the mother's parental rights is in the children's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Affirmed**

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Mark Walker, Goodlettsville, Tennessee, for the appellant, Sandra Jane Riley.

Paul G. Summers, Attorney General and Reporter, and Elizabeth C. Driver, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

Respondent/Appellant Sandra Jane Riley ("Mother") is the mother of the two boys at issue in this case, T.L.R. (born August 9, 1993) and A.W.R. (born December 26, 1997).[1] On September 3, 1999, the children were taken into the custody of Petitioner/Appellee Department of Children's Services for the State of Tennessee ("DCS"). The DCS took the children in response to a complaint by a nurse at the boys' daycare that A.W.R. had what appeared to be cigarette burns on his body that Mother could not adequately explain.

Soon after the children were placed in DCS custody, Mother entered into a permanency plan with DCS. According to the plan, Mother was to (1) obtain a parenting assessment; (2) attend counseling at a mental health clinic; (3) obtain an alcohol and drug assessment; (4) submit a safety plan for the children in case anything happened to her; (5) maintain adequate housing and participate with Homemaker Services; (6) obtain employment; and (7) stop using illegal drugs. Although Mother completed some requirements of the plan, after nearly two years passed, DCS concluded that Mother had not completed essential elements of the permanency plan, including maintaining adequate housing and stable employment, and ceasing the use of illegal drugs.

Consequently, on August 1, 2001, the DCS filed the petition below to terminate Mother's parental rights.[2] DCS asserted in the petition that grounds for termination existed, namely, that Mother had failed to complete the requirements of the permanency plan, and that conditions that made it unsafe for the children to return to Mother's custody persisted. DCS asserted that it was in the children's best interest to terminate Mother's parental rights. The hearing on the petition was held on two separate days, November 14, 2001 and February 22, 2002.

Mother testified extensively at the hearing. On the first day, Mother testified that she began trying to complete the items in the DCS permanency plan shortly after the boys were taken into DCS custody. She attended an anger management program, even though it was not required by the plan, and she attended parenting classes, as required by the plan. She also received aid from Homemaker Services in her home. During this time, Mother had regular, supervised biweekly visits with the boys. In January 2000, however, Mother tested positive for cocaine and marijuana. Consequently, the Homemaker Services was discontinued and Mother went to Buffalo Valley, an inpatient drug treatment facility. Mother remained in Buffalo Valley for three weeks. Mother testified that the

---

[1]Mother also has a daughter who was eighteen years old as of the date of the trial below who lives with her father in an unknown location. Mother had not seen her daughter since the child was four years old. In addition, Mother has a son who was ten years old as of the date of trial and who lived in Oregon with his great aunt. Mother had not seen him since he was nineteen months old. The custody of those children are not at issue in this case.

[2]The petition also sought to terminate the rights of T.L.R.'s father, who was unknown, and A.W.R.'s father, who was William Taylor. Taylor, however, denied paternity and did not defend against the petition to terminate his rights. The trial court terminated both of the fathers' parental rights. Neither of the fathers' rights are at issue in this appeal.

Buffalo Valley program helped her with her problems, but acknowledged that she relapsed around May 2000 by using alcohol.

Later, in early fall of 2000, Mother worked for a temporary agency. Around November 2000, she got a permanent job at Water Bonnet Manufacturing, Inc., in Springfield, Tennessee, and worked there for about six months. In the fall of 2000, Mother was permitted to have unsupervised visits with the boys. On December 1, 2000, however, the unsupervised visits were discontinued after it was discovered that Mother had lost her mobile home and moved into a motel, at which the boys stayed during their November 16, 2000, visitation. Thereafter, Mother's visits with the boys were always supervised.

Mother admitted that she tested positive for cocaine on February 28, 2001. After that, she participated in a twenty-day program at Bradford Health Service, an outpatient drug treatment facility in Nashville, Tennessee. On the twentieth day, however, she relapsed.

After her experience at Bradford, Mother's situation became worse. Mother said that she was fired from her job at Water Bonnet Manufacturing in April 2001 because of her absences from work. In her testimony, Mother claimed that her absences were due to her severe depression. During her employment with Water Bonnet, Mother moved out of the motel and again began renting another mobile home. When she lost her job, she was unable to pay the rent on the mobile home she was living in. By June 2001, Mother had temporarily moved in with a friend and was smoking between $20 and $200 worth of crack cocaine per day. She acknowledged that she had been doing so since April 2001. Mother sold all her furniture and borrowed money from friends to support her drug habit. Finally, DCS called mobile crisis, and Mother was hospitalized for four days. In her testimony, Mother said that she believed that entering the hospital at that time probably saved her life.

In July 2001, Mother began an eight-week outpatient program at Foundations, another intensive out-patient drug treatment program. In her testimony, she admitted that she relapsed the first three weekends during the program by drinking and taking "a hit of dope every now and then." Despite this, she graduated from the program on August 27, 2001, and she moved into Women's Safe Haven, a halfway house operated by Foundations. She testified that she was unemployed and stayed at Safe Haven rent free.

By the first day of trial, Mother was again participating in the day program at Foundations, attending two and one half hours each day. Mother admitted that, about one week prior to the first day of trial, she got drunk and smoked crack cocaine. Nevertheless, she concluded her testimony by asserting that she had been making progress, and that she could provide a stable home for her children if she were given a little more time.

Mother's case worker, Marzena Krahel ("Krahel"), also testified at trial. Krahel was assigned to Mother's case in October 2000. She corroborated many of the facts to which Mother testified. She recounted the incident on December 1, 2000, in which Mother's unsupervised visits with the

boys were stopped after it was discovered that she was living in a motel.[3]  Krahel also testified that, on January 4, 2001, Mother rented her second mobile home and called Krahel to inform her of her new address.  On January 10, 2001, Krahel conducted a home visit at Mother's home, which was satisfactory.  Consequently, on February 9, 2001, Krahel took the children for a supervised visit at Mother's home.  Krahel described it as a "wonderful visit for two hours when [Mother] showed [the children] her Christmas presents."  Another visit was scheduled for early March 2001.  As Mother acknowledged in her testimony, however, she tested positive for cocaine on February 28, 2001, and went to the outpatient program at Bradford.  Krahel testified that in April, May, June, and July 2001, Mother had eight scheduled visits with the children, but she canceled three of them.

Krahel noted that Mother had completed some items on the permanency plan, including obtaining a parenting assessment and mental health counseling.  Krahel testified, however, that important requirements in the permanency plan had not been met; Mother had not obtained employment which would provide long-term support, she had not obtained adequate housing to meet the needs of her family, and she had not completely stopped using illegal drugs.

The trial resumed over three months later on February 22, 2002.  On that day, the director of Harbor House, a residential program for mentally ill adults, testified that on December 17, 2001, after the first day of trial on November 14, 2002,  Mother became a resident at Harbor House.  She testified that Mother had been participating in a program at Park Center & Mental Health ("Park Center") for drug rehabilitation, and that Mother had been receiving medication and counseling for depression.[4]  Erica Osmondsen, Mother's case manager at Park Center, testified that Mother had set a goal to be able to have her children back in her custody.  She said that Mother had been trying to find a job and stable housing, and that she was trying to maintain her sobriety.

Mother again testified on her own behalf.  She said that, since the first day of trial, she had become a resident at Harbor House and was attending the day program at Park Center.  Mother said that she was training in the clerical unit at Park Center in order to "freshen up" her office skills.  She said that she was actively seeking employment, and noted that she had sent her resume to twenty-three businesses in the prior week.  At the time of the hearing, she had not yet procured a job and, therefore, had not been able to secure stable housing.  She testified, however, that she was "on a mission to get [her] life together and quit doing [drugs]."  At the conclusion of the testimony, the trial court took the matter under advisement.

The final witness at trial was the boys' foster mother, Amy Bradford ("Bradford").  She testified that the boys' behavior was adversely affected by their visits with Mother.  Bradford said

---

[3]Krahel also testified that on October 11, 2000, the children's foster father reported to DCS that A.W.R. had returned from the last unsupervised visit with Mother with his penis and genital area very red and irritated. DCS opened a child protective services investigation, and unsupervised visits stopped.  The investigation showed that the irritation was caused by a hygiene problem, and unsupervised visits resumed on November 16, 2000.

[4]Park Center & Mental Health is the parent company of Dede Wallace Centerstone, another rehabilitation facility.

that, after those visits, the boys were "quite a handful," and that they did not obey and they did not listen to her for some time afterwards. She said that it usually took a week or more to get the boys "straightened out" after a visit with Mother. Bradford also testified that she and her husband were willing to adopt the boys if Mother's parental rights were terminated.

On March 21, 2002, the trial court entered a written order granting the DCS petition to terminate Mother's parental rights. Based on the Mother's continued substance abuse, her lack of housing, and her lack of employment, the trial court concluded that clear and convincing evidence established that grounds for termination existed pursuant to Tennessee Code Annotated § 36-1-113(g)(2), in that Mother had not substantially complied with the parenting plan. In addition, the trial court found that grounds had been established pursuant to section 36-1-113(g)(3)(A), because the children had been removed from Mother's home for over six months, and the conditions which led to their removal, or other conditions that would cause the children to be subject to further neglect or abuse, still persisted and were not likely to be remedied at an early date. The trial court then assessed the best interests of the children, and determined that termination of Mother's parental rights was in their best interest, noting that continuation of the relationship would greatly diminish the children's chances of early integration into a stable and permanent home. From this order, Mother now appeals.

Mother argues that the proof relating to her conduct did not rise to the level of substantial non-compliance with the DCS permanency plan. *See* 36-1-113(g)(2). Further, Mother claims that the elements of 36-1-113(g)(3)(A) were not proven at trial. She concedes that the children had been removed from her care for over six months, but she claims that the trial court erred in determining that the other three prongs of that section had been met.

Under Tennessee Code Annotated § 36-1-113(c), a parent's rights to care and custody of his or her children may be terminated upon the establishment of:

> (1) A finding by the court by clear and convincing evidence that the grounds for termination or parental or guardianship rights have been established; and

> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c)(1)-(2) (2001). Because the decision to terminate parental rights involves fundamental constitutional rights, both elements of section 36-1-113(c) must be proven by clear and convincing evidence. *See In re: C.M.R.*, No. M2001-00638-COA-R3-JV, 2002 WL 192562, at *3-*4 (Tenn. Ct. App. Feb. 7, 2002). Clear and convincing evidence "eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence." *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995). Considering this heightened standard, we review the trial court's findings of fact de novo on the record, with a presumption that the trial court's factual findings are correct. Tenn. R. Civ. P. 13(d); *see In re: C.M.R.*, WL 192562, at *4; *In re: Copeland (Graham v. Copeland)*, 43 S.W.3d 483, 485 (Tenn. Ct.

App. 2000). We review the trial court's conclusions of law de novo, affording those legal conclusions no such presumption of correctness. ***In re: Copeland***, 43 S.W.3d at 485.

Mother argues that the trial court erred in determining that she did not substantially comply with the parenting plan. She admits that, as of both days of trial testimony, she did not have adequate housing or income to provide for her children. She contends, however, that "it was only a matter of time" before she attained proper housing and a steady income. Mother notes that she has a high school education and a post-high school degree at a technical school, and estimates that she could earn $14.00 per hour. She refers to her trial testimony that she was being considered for a position that paid $20,000 per year, and argues that after she earned some money, she would then be able obtain proper housing. Likewise, Mother argues that the trial court should not have found that grounds were established under T.C.A. § 36-1-113(g)(3)(A), persistent conditions that would cause the children to be subject to further neglect or abuse, because all of Mother's problems were soon to be corrected.

In this case, the evidence establishing grounds for termination is not just clear and convincing, it is undisputed. Mother's own testimony establishes that, after the children were taken from her custody in the fall of 1999, by February 2002, Mother still had not obtained adequate housing or employment. Moreover, in her testimony in November 2001, Mother conceded that she had used drugs as recently as the week prior to her testimony. Maintaining housing, obtaining employment and refraining from using drugs are clearly essential elements of the DCS permanency plan. Moreover, Mother's failure to do so is obviously a condition which would cause the children to be subject to further neglect or abuse. We affirm the trial court's finding that grounds for termination existed under Tennessee Code Annotated §§ 36-1-113(g)(2) and (g)(3)(A).

Mother also argues that termination of her parental rights was not in the boys' best interest. She asserts that she has maintained a bond with them while they have been in foster care, and notes that she loves her children and that they love her. This Court does not question Mother's love for her children, nor does it minimize the difficulty of overcoming her substance addictions and maintaining a home and employment. The trial court, however, correctly considered the fact that, after the children had been out of her custody since 1999, by February 2002 Mother continued to relapse in her recovery from her addictions and still had not obtained stable employment and housing. Moreover, the trial court did not err in noting that the children "are flourishing in their foster care placements," and that termination of Mother's parental rights would allow the children an early integration into a stable and permanent home, namely, adoption by their foster parents. Under these circumstances, we cannot conclude that the trial court erred in finding that the children's best interests would be served by terminating Mother's parental rights. Accordingly, we affirm the trial court's order terminating Mother's parental rights.

The decision of the trial court is affirmed. Costs are to be assessed to the appellant, Sandra Jane Riley, and her surety, for which execution may issue, if necessary.

.                                     _____

                                        HOLLY KIRBY LILLARD, JUDGE